UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM T. DIVANE, JR.,
KENNETH J. BAUWENS,
MICHAEL J. CADDIGAN,
LARRY CRAWLEY,
SAMUEL EVANS,
TIM FOLEY,
THOMAS C. HALPERIN,
DANIEL MEYER,
KEVIN O'SHEA,
and MICHAEL L. WALSDORF,
as the ELECTRICAL INSURANCE
TRUSTEES,

     Plaintiffs,

  v.

AMERICAN SIGN & LIGHTING CO.,

     Defendant.

No.

FILED: MARCH 26, 2008
08CV1749      PH
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

## COMPLAINT

The plaintiffs, WILLIAM T. DIVANE, JR., KENNETH J. BAUWENS, MICHAEL J. CADDIGAN, LARRY CRAWLEY, SAMUEL EVANS, TIM FOLEY, THOMAS C. HALPERIN, DANIEL MEYER, KEVIN O'SHEA, and MICHAEL R. WALSDORF, as the ELECTRICAL INSURANCE TRUSTEES (the "Trustees"), by their attorney, David R. Shannon, for their complaint against the defendant, AMERICAN SIGN & LIGHTING CO. ("American Sign") state:

1.    This action arises under the Labor-Management Relations Act, as amended (29 U.S.C. § 141 et seq.), and the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.).  Jurisdiction is founded on the existence of questions arising thereunder.

2.   Venue is proper in the Northern District of Illinois pursuant to 29 U.S.C. § 1132(e)(2) by virtue of the fact that the Trustees' administrative offices are located in Chicago, Illinois.

3.   The plaintiffs are the duly appointed and acting trustees under an agreement originally entered into on June 24, 1930, between the Electrical Contractors' Association of City of Chicago ("ECA") and Local 134, International Brotherhood of Electrical Workers, and are known as the Electrical Insurance Trustees.

4.   American Sign is an electrical contractor which signed a contract ("Sign Agreement") with Local Union No. 134, International Brotherhood of Electrical Workers on July 1, 2004. A copy of the contract is attached hereto as Exhibit A.

5.   Under the Sign Agreement, American Sign agreed to pay certain wage rates and, in addition, to file a monthly report with and make a monthly contribution to the Trustees to cover certain fringe benefits.

6.   Article X of the Sign Agreement requires American Sign to furnish a bond to guarantee the payment of fringe benefit contributions with the Electrical Insurance Trustees as "obligee."

7.   Section (g)(1) of Article First of the insurance trust agreement ("Insurance Agreement") pursuant to which the plaintiffs are appointed trustees and which describes the duties and responsibilities of the Trustees provides as follows:

The Trustees shall have plenary power to make, from time to time, and to enforce such rules and regulations for the determination of eligibility for benefits, for the proper collection and handling of said Fund, for the allocation of benefits to those eligible for it, for the determination of who may be beneficiaries and the terms and conditions under which benefits shall be given to the beneficiaries and forfeited by them, and for the determination of methods of procedure and every other question (irrespective of its nature) arising in the collection and administration of said Fund, and generally in the carrying out of this Agreement, and in fully and completely accomplishing its purpose.

8.   Section (g)(2) of Article First Insurance Agreement

provides as follows:

"Each employer shall make continuing, prompt and proper payments to the Trust Fund in such amounts as shall have been agreed upon in writing from time to time, together with such amounts as may be provided for as liquidated damages with respect to delinquent accounts."

9.   Section (g)(3) of Article First of the Insurance

Agreement provides in part as follows:

"The Trustees, in their fiduciary capacities, shall have the power to demand and collect the contributions of the Employers to the Fund* * *. In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest at the rate of 6% per annum on the moneys due to the Trustees from the date when the payment was due to the date when payment is made, together with all expenses of collection incurred by the Trustees."

10.   Section (g)(5) Article First of the Insurance Agreement

provides in part as follows:

"Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their Social Security numbers, the hours worked by each employee and such other information as the Trustees may reasonably require in connection with the administration of the Trust.  The Trustees may, by their representatives, examine the pertinent records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in

-3-

connection with the proper administration of the
Trust."

11.  Section (o) of Article First of the Insurance Agreement
provides:

> "To the fullest extent permitted by federal law, the
> Trustees shall have the discretionary authority to determine
> all questions arising in connection with the Trust Fund ...
> or as to the construction of the language or meaning of ...
> this instrument or as to any writing in connection with the
> operation of the Trust Fund or otherwise and the decision of
> a majority of the Board of Trustees, if made in good faith,
> shall be binding upon all persons dealing with the Trust
> Fund or claiming any benefits thereunder...."

12.  On October 15, 2007, Financial Benefits Insurance
Company ("FBIC"), through its agent, C.W. Olson & Co., American
Sign's surety, informed the Trustees that American Sign's fringe-
benefit bond, which the surety issued to cover American Sign's
obligations under the Sign Agreement, would be canceled effective
November 18, 2007.  A copy of the letter is attached hereto as
Exhibit B.

13.  American Sign has failed to provide a fringe-benefit
bond to replace the bond canceled by FBIC.

14.  American Sign is be performing work within the scope of
work clause of the Sign Agreement, and within the jurisdiction of
Local 134 despite the breach of its obligation to provide valid
fringe benefit bonds to the Trustees.  In March 2008, American
Sign reported that it employed two electricians under the Sign
Agreement in February 2008.

15.  The Trustees' pension obligations to plan participants
and beneficiaries are based on the terms of the plans and are
independent of employers' obligations to fund the plans.

-4-

However, the actuarial calculations which determine the amount of the fringe benefit contributions are based on an assumption that participating employers will report all covered work and pay contributions for all hours of bargaining unit work.  If some employers do not contribute, the Trustees will be required to provide some benefits without having received corresponding contributions.  If that occurs, the shortfall must be made up by decreasing the amount of benefits for all participants or increasing the contributions rate for other employers.

16.  The Trustees will suffer irreparable harm by incurring unfunded liabilities which would jeopardize the actuarial soundness of the funds which the Trustees administer if American Sign fails to submit contributions.  The Trustees must provide pension credits for all hours worked by American Sign's electricians regardless of whether American Sign honors its obligation to pay contributions to the Trustees.  The plan participants are employees of American Sign and their dependents could suffer irreparable harm from a suspension of health and welfare benefits while contributions remain unpaid without back-up security.

17.  The Trustees have a fiduciary duty under ERISA to use all reasonable means to ensure the collection of fringe benefit contributions due under the Sign Agreement in order to maintain the financial health of the plans they administer.

18.  American Sign should be enjoined from performing bargaining unit work in the jurisdiction of Local 134 in order to

-5-

minimize the amount of unfunded liabilities which the Trustees
will incur.

19.  The Trustees' legal remedy -- a money judgment -- is
inadequate because American Sign may be insolvent.  The Trustees
may be unable to collect a money judgment, they are entitled to
the security of a bond if American Sign is the subject of
insolvency proceedings, and they should not have to assume the
risk that American Sign will default on its obligations and leave
the Trustees without an effective remedy.

20.  It is more than likely that the Trustees will prevail
on the merits.  The furnishing of a fringe benefit bond is an
absolute requirement under the Sign Agreement.

21.  Ordering American Sign to furnish a fringe-benefit bond
would not impose a hardship on American Sign but would only
require American Sign to honor its contractual obligation to
provide security to the Trustees and their plan participants and
beneficiaries.

WHEREFORE, the plaintiffs, WILLIAM T. DIVANE, JR., KENNETH
J. BAUWENS, MICHAEL J. CADDIGAN, LARRY CRAWLEY, SAMUEL EVANS, TIM
FOLEY, THOMAS C. HALPERIN, DANIEL MEYER, KEVIN O'SHEA, and
MICHAEL R. WALSDORF, as the ELECTRICAL INSURANCE TRUSTEES,
request the court to enter an order enjoining AMERICAN SIGN &
LIGHTING CO. from continuing to engage in work within the scope
of work clause in the Sign Agreement and within the jurisdiction
of Local 134, I.B.E.W., for so long as it is a signatory of that
agreement, unless and until it furnishes the Trustees with a

-6-

duly-executed standard fringe-benefit bond.  The Trustees also request the Court to grant such other legal or equitable relief as the Court deems appropriate, including an award of attorneys' fees.

WILLIAM T. DIVANE JR., et al., as the
ELECTRICAL INSURANCE TRUSTEES

/s/ David R. Shannon
By: _____
One of Their Attorneys

David R. Shannon
Tenney & Bentley, LLC
111 West Washington Street
Suite 1900
Chicago, Illinois 60602
(312) 407-7800

# SIGN AGREEMENT

THIS AGREEMENT entered into and dated this lst day of July, 2004 between:

**American Sign & Lighting Co.**

08CV1749   PH
JUDGE BUCKLO
MAGISTRATE JUDGE COLE

located in Illinois, hereinafter referred to as the "Employer" or "Company" and LOCAL UNION NO. 134, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, hereinafter referred to as the "Union." For the purpose of brevity the Union and the Company may be hereinafter jointly referred to as "the parties."

## WITNESSETH:

The parties hereto desire to establish a standard of conditions under which the employees shall work for the Employer and to provide for rates of pay, hours of work and other conditions of employment for such employees to the end that mutual relations may be regulated with a view to securing harmonious cooperation and provide a procedure for the prompt and equitable adjustment of all grievances and disputes that may arise during the tenure of this Agreement, therefore, the parties agree as follows:

## ARTICLE I
### Effective Date - Termination

**Section 1.** This Agreement shall **take effect as of 12:01 a.m., July 1, 2004**, and remain in effect **through June 30, 2005**, and shall continue in full force and effect from year to year thereafter, subject to amendment or termination in the way later herein provided. However, changes during the tenure of this Agreement which are mutually agreeable to both parties may be made at any time.

**Section 2.** The Employer or the Union may amend this Agreement by notifying the other, in writing, at least sixty (60) days prior to the termination date of the year under consideration. Should the parties be unable to settle any and all differences concerning the proposed amendments by negotiation and/or conciliation, then in that event the points of difference shall be settled by the applications of the provisions of Article IV.

**Section 3.** The Employer or the Union may terminate this Agreement by notifying the other, in writing, at least sixty (60) days prior to the annual termination date under consideration and during the sixty (60) days interim the parties shall endeavor to settle all controversial matters involved, including the matters which caused the sending of the termination notice, upon their failure to fully agree or prior to that termination date this Agreement shall automatically terminate on that termination date unless the parties by mutual consent extend the termination date or agree on a definite means of composing all points of difference.

## ARTICLE II
### Work Covered - Recognition - Union Security -
### Apprentice Ratio - Supervision - Union a Part of the I.B.E.W.

**Section 1.** This Agreement applies to all employees of the Employer engaged in performing electrical construction and repair work necessary for the assembly, erection, cleaning and maintenance of all interior and exterior electrical signs; the bending, pumping and repairing of all tubes used as conductors of electricity for whatever purpose intended. Electrical work on such signs shall also include the installation, connection, repairing and servicing of all transformers, wires, cables, conduits, supports and insulators within or an the sign itself; also the erection and installation of all neon tubing used for interior lighting or exterior outline lighting, including all types of work heretofore performed by employees represented by the Union. All work will be made and installed in accordance with local building codes.

1



EXHIBIT
**A**

(a)   The electrical construction work referred to in Section 1 above shall be performed by Group A Journeymen Wiremen. The maintenance and repair work referred to in Section 1 above and all shop electrical work may be performed by Group B Sign Maintenance Journeymen, and Group B Sign Maintenance Apprentices. The sign cleaning work may be performed by Sign Cleaners and all neon tube bending, pumping and repairing shall be done by Glass Letter Benders.

(b)   The Employer may use Sign Cleaners to perform maintenance repair and shop electrical work, providing such Sign Cleaners have been employed by the Employer for a continuous period of thirty (30) or more months, and further providing the Employer requests the Union in writing to issue temporary probationary credentials to such Sign Cleaners and certifies to the Union that the Employer will compensate such individuals with the rate of wages as set forth in Article VII of this Agreement while performing such work. The ratio of such individuals to Group B Sign Maintenance Journeymen shall not exceed one (1) to each five (5) journeymen.

(c)   The Employer shall at all times employ at least one (1) Group A Journeyman Wireman on work covered by this Agreement. Such Group A Journeyman Wireman shall work under and be compensated therefore in accordance with the terms and provisions of the agreement currently in effect between the Electrical Contractors' Association and Local Union No. 134. The Employer agrees to furnish such Group A Journeyman Wireman with a minimum of forty (40) hours work per week, except when circumstances beyond the control of the Employer prevent him from doing so.

(d)   Group B Sign Maintenance Journeymen covered hereunder may make temporary connections to electric signs at the time of erection, providing the time necessary to make such connection does not exceed two (2) man hours of labor.

**Section 2.** The Company recognizes the Union as the sole and exclusive collective bargaining agency for all employees performing work covered by the terms of this Agreement. The Company should furnish monthly bargaining unit reports listing bargaining unit members by name, seniority date, social security numbers, classification and rate of pay.

**Section 3.** It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union shall remain members during the term of this Agreement and those who are not members on the date on which this Agreement is signed shall, from and after thirty-one (31) days following the effective date of this Agreement or the date of their employment, whichever is later, become and remain members in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which this Agreement is signed shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in this Union.

**Section 4.** The Employer may hire Glass Letter Bender Apprentices provided the ratio of such Apprentices to Glass Letter Bender Journeymen shall not exceed one (1) Apprentice to each three (3) Journeymen, or majority fraction thereof and further provided that the total number of Glass Letter Bender Apprentices to be employed in the shop of the Employer shall be limited to three (3).

(a)   The Employer may hire Group B Sign Maintenance Apprentices, provided the ratio of such Apprentices to Journeymen shall not exceed one (1) Apprentice to each Five (5) Group B Sign Maintenance Journeymen, or majority fraction thereof.

(b)   Such Apprentices, after serving a probationary period of ninety (90) days must be properly indentured.

(c)   Group B Sign Maintenance Apprentices shall not perform work covered by this Agreement alone. They shall, while performing work covered hereunder, be

2

accompanied by Group Sign Maintenance Journeymen who will properly instruct them in the various skills and theory required to perform work covered by this Agreement.

Case 2:05-cv-01749   Document 152   Filed 03/26/20   Page 8 of 11

(d)      Sign Cleaners may be transferred to the Group B Sign Maintenance Apprentice classification, providing the Employer agrees to indenture them in accordance with the provisions of subparagraph (b) of this Article. Sign Cleaners so transferred shall not suffer a reduction in wages as a result thereof. They shall continue to receive the wage rate they were receiving at the time of transfer until such time as they reach the time slot in the Group B Sign Maintenance Apprentice progression schedule where the wage rate is equal to or higher than the Sign Cleaner rate they were receiving at the time of transfer, and thereafter they shall receive the automatic wage increases as they become due in accordance with the Group B Sign Maintenance Apprentice wage schedule set forth in Article VII of this Agreement.

**Section 5.** When five (5) or more Group B Sign Maintenance Journeymen or Glass Letter Bender Journeymen covered by this Agreement are employed in the shop of the Company, one (1) Group B Sign Maintenance Journeyman or Glass Letter Bender Journeyman shall be designated as Foreman. He may or may not perform work covered hereunder. He shall receive at least fifty cents (50¢) per hour in excess of the Journeyman's rate for his classification as set forth in Article VII hereof.

(a)      Notwithstanding the provisions of the foregoing paragraph, when five (5) or more Glass Letter Bender Journeymen are employed in the shop of the Company, one (1) Glass Letter Bender Journeyman shall be designated as Foreman. He may or may not perform work covered hereunder. He shall receive at least fifty cents (50¢) per hour in excess of the Glass Letter Bender Journeyman rate as set forth in Article VII hereof.

**Section 6.** Local Union 134 is a part of the International Brotherhood of Electrical Workers and any violation or annulment of the Agreement of this or any other Local Union of the I.B.E.W. by an individual employer will be sufficient cause for cancellation of his agreement after the facts have been determined by the International Office of the Union. The Employer further agrees that he will not sublet, assign or transfer any work in connection with electrical sign work to any other person, firm or corporation if such subletting, assigning or transferring will cause the loss of work opportunities to employees in the individual Employer's establishment covered by this Agreement. Any such subletting, assigning or transferring shall be allowable after a mutual determination has been made by the representatives of the parties that such action is not in conflict with the preceding sentence.

## ARTICLE III
## Method of Negotiation

**Section 1.** The Employer and the Union agree to meet and deal with each other through their duly accredited officers and committees on matters relative to hours, wages and other conditions of employment of the employees covered by this Agreement. Should any differences arise concerning the interpretation or application of this Agreement (which may in some instance require consideration by the Employer and the Business Manager of the Union) the Employer and the Union representatives shall meet and endeavor to settle such differences and in case they fail to fully agree, the points of difference may be submitted at the request of either or both parties to an Arbitration Board selected as herein specified.

**Section 2.** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Sign industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

3



## ARTICLE IV
## Grievance and Arbitration

Whenever any grievance, dispute or controversy arises as to the interpretation, application or performance of any provision of this Agreement, an earnest effort will be made by all parties affected to achieve a fair and prompt adjustment of such grievance, and there shall be no suspension of work. To facilitate prompt and effective handling of grievances, the following procedures shall be followed.

**Step 1.** The aggrieved employee will discuss the grievance with his immediate supervisor.

**Step 2.** If no satisfactory adjustment is reached in Step 1, Union representatives will meet with the Company President (or someone designated by him) and the aggrieved employee (if any) in an effort to effect settlement.

**Step 3.** The Company and the Union agree to refer matters to grievance mediation when mutually agreed to. Mediation will proceed the arbitration step, but in no way will it prevent arbitration if the matter is not resolved in mediation.

Grievances shall be presented in Step 1 within three (3) working days after they arise. Step 2 must be invoked within three (3) working days after the supervisor's decision in Step 1. In the event the Union invokes this Grievance Procedure, it shall begin at Step 2. Any grievance which has not moved to the next Step within the prescribed period shall be deemed settled at the preceding Step, but this provision shall not preclude the Employer and the Union from meeting periodically in an effort to maintain harmonious administration of this Agreement.

### Arbitration

**Section 1. Arbitration Board** - Any grievances which may arise between the Employer and the Union which are not satisfactorily settled between the representatives of the Employer and the Union in Step 2, Article IV, may be referred at the request of the Union, to arbitration. Upon filing of the written request for arbitration, a representative of the Union and a representative of the Company shall attempt to agree upon an arbitrator to pass upon the matter. If they are unable to agree upon an arbitrator within two (2) weeks of the time of the filing of the request, the parties will request the Federal Mediation and Conciliation Service (or the American Arbitration Association) to submit a list of seven (7) arbitrators from which the parties may jointly make such selections. Either party may reflect a list of arbitrators. Within two (2) weeks after receipt of such list, the parties shall meet to choose one person from the list to service as arbitrator by alternately striking one name each, until but one (1) name remains and the person so named shall be the arbitrator for the grievance. It is understood the party who struck the last name from the list will be required to strike the first name from the next list. The arbitrator shall be notified of his/her selection by a joint letter from the Company and the Union in which he/she is requested to offer dates for a hearing. The Union and the Company may agree to process more than one grievance to an arbitrator.

**Section 2. Arbitrator's Authority.** The arbitrator shall have no authority to: add to, subtract from, or in any way modify the provisions of this Agreement; not substitute his/her discretion for that of management. The decision of the arbitrator shall be final and binding on the Company, the Union and the aggrieved employee.

**Section 3. Suspension/Discharge Grievances** - Should it be determined that an employee, other than a-probationary employee, was suspended or discharged without just cause, he shall be restored to his former status. The Company shall have the right to credit against any backpay awarded any earnings, unemployment compensation, remuneration, etc. received by the employee during the period involved.

**Section 4. Decision of the Arbitrator** - The decision of the arbitrator made in compliance with the foregoing shall be in writing, shall include reasons for such findings and the conclusion, and shall be

4

**Section 5. Expenses** - Each party shall be responsible for one-half (2) of the expenses and the fees of the arbitrator designated under this Article as well as any expenses for the services of a court reporter and for copies of transcripts going to the arbitrator. Otherwise each party shall bear the cost of the presentation of its own case.

**Section 6. Union Responsibility** - only the Union shall have the right to process a grievance to arbitration. The Union may process, adjust or settle grievances through or at any step of the grievance and arbitration procedure.

**Section 7. Time Limits** - Time limits are to be adhered to, but any time limit may be extended by mutual agreement of the parties.

## ARTICLE V
## Seniority

**Section 1. Definition** - The seniority of each Classification of Employees to be covered by this Agreement shall accrue and be determined by the employee's length of service with the company.

**Section 2. Probationary period and Layoffs/Recalls** - Employees shall be regarded as temporary employees until they have established seniority; seniority may be acquired by working sixty (60) scheduled working days on the types of work covered by this Agreement, in which event the employee will be automatically credited with seniority as of the date he was hired.

a. Employees who have not established seniority shall be laid off first.

b. Thereafter employees shall be laid off in the inverse order of their established seniority.

c. The foregoing provisions of (a) and (b) need not apply if the application hereof would require the Company to layoff an employee or employees possessed of essential skills necessary to perform properly the work available at the time of layoff not possessed by an employee or employees with greater seniority.

d. When adding to the forces those having established seniority most recently laid off on account of curtailment of work shall be the first to be reemployed if available and physically able to return to work and if they possess the qualifications required, or have heretofore satisfactorily preformed the work available.

**Section 3. Termination of Seniority** - Seniority shall be deemed to have been broken for the following reasons:

a. If the employee quits.

b. if the employee is discharged and not reinstated.

c. if the employee is absent for three (3) working days, unless a reason satisfactory to the Employer is given for his absence.

d. If the employee who has been laid off fails to return to work within three (3) days after being properly notified at the employee's last known address to report to work and does not give a reason satisfactory to the Employer for failure to report.

 

e.    if the employee is laid off for a continuous period in excess of one (1) year.

f.    if the employee retires.

## ARTICLE VI
## Hours and Overtime

**Section 1.**  Five (5) consecutive eight (8) hour days to be worked between the hours of 7:00 a.m. and 3:30 p.m. with one-half (1/2) hour for lunch shall constitute a regular workweek.  The start time may be adjusted by one-hour earlier/later for starting time.

**Section 2.** Should two (2) or more regularly scheduled shifts be required, the second shift shall start at 4:30 p.m. and terminate at 12:30 a.m. with one-half (1/2) hour for lunch.  The third shift shall start at 12:30 a.m. and terminate at 8:00 a.m. Employees shall be compensated for eight (8) hours work at straight time rates for time worked on the second and third shifts.

**Section 3.** When necessary, shifts with starting and terminating hours other than those specified above may be instituted and maintained by mutual agreement between the representative of the Employer and the business representative of the Union.

**Section 4.** Time and one-half the regular rate of pay shall be paid for the first three (3) hours of time worked beyond the regular working day and double time for all time worked thereafter.

**Section 5.** Time and one-half the regular rate of pay shall be paid for the first eight (8) hours worked on Saturday; any time worked after eight (8) hours will be paid at double time.  Double time shall be paid for all time worked on the Sunday and the following legal holidays: New Year's Day, Decoration Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving Day, Christmas Eve, Christmas Day, New Year's Eve, and Good Friday, or days celebrated as such.

**Section 6.** Each Glass Letter Bender Foreman, Glass Letter Bender Journeyman, Glass Letter Bender Apprentice, Group B Sign Maintenance Foreman, Group B Sign Maintenance Journeyman, Group B Sign Maintenance Apprentice and Sign Cleaner employed under the terms of this Agreement shall receive eight (8) hours, pay at the regular hourly rate although no work is performed on the following holidays or days celebrated as such even though such holidays fall on Saturday or Sunday: New Year's Day, Decoration Day, July Fourth, Labor Day, Thanksgiving Day, the Friday after Thanksgiving Day, Christmas Eve, Christmas Day, New Year's Eve and Good Friday.

To qualify for holiday pay employees must be employed at least thirty (30) days prior to the holiday under consideration.

**Section 7.**  When men are called back to work after having been released from their regular day's work, they shall receive the applicable overtime rates but in no case shall they receive less than three (3) hours' pay, time to start when men are called and continue until their return, provided however, when work necessary to care for the call extends beyond the starting time of the employee's regular workday, overtime shall then terminate and straight time shall apply during such regular workday.

**Section 8.** Employees who report to work shall receive a minimum Of two (2) hours pay.  If such employees perform any work, they shall receive a minimum of four (4) hours' pay.

# ARTICLE VII
## Wages

**Section 1.** The minimum hourly wage rates for employees covered by this agreement are set forth below: Effective July 1, 2003 & July 1, 2004 the total wage/benefit package will be increased by $1.45. The allocations of monies for years 2003 & 2004 will be made after adjusting for H & W and Pension.

| Classification | Effective Date | Effective Date | Effective Date | Effective Date |
|---|---|---|---|---|
| **Glass Letter Benders** | July 1, 2002 | January 1, 2003 | July 1, 2003 | July 1, 2004 |
| Foreman | $24.99 | $24.49 | TBA* | TBA* |
| Journeyman | $24.49 | $23.99 | TBA* | TBA* |
| **Apprentices** | | | | |
| lst 6 months - 45% | 11.02 | 10.79 | | |
| 2nd 6 months - 50% | 12.24 | 11.99 | | |
| 3rd 6 months - 55% | 13.46 | 13.19 | | |
| 4th 6 months - 60% | 14.69 | 14.39 | | |
| 5th 6 months - 65% | 15.91 | 15.53 | | |
| 6th 6 months - 70% | 17.14 | 16.79 | | |
| 7th 6 months - 80% | 19.58 | 19.19 | | |
| 28th 6 months - 90% | 22.03 | 21.59 | | |

Thereafter Journeyman's Rate.
* TBA (To be allocated)

**Group B Sign Maintenance**

| | | | | |
|---|---|---|---|---|
| Foreman | $23.72 | $23.22 | TBA* | TBA* |

Sign Maintenance
**Journeymen and Sign Cleaners** performing maintenance, repair and shop electrical work.

| | | | | |
|---|---|---|---|---|
| | $23.22 | $22.72 | TBA* | TBA* |

**Sign Maintenance Apprentices**

| | | | |
|---|---|---|---|
| lst | 6 months | 45% | 10.45 | 10.22 |
| 2nd | 6 months | 50% | 11.61 | 11.36 |
| 3rd | 6 months | 55% | 12.77 | 12.50 |
| 4th | 6 months | 60% | 13.93 | 13.63 |
| 5th | 6 months | 65% | 15.09 | 14.77 |
| 6th | 6 months | 70% | 16.25 | 15.90 |
| 7th | 6 months | 80% | 18.58 | 18.18 |
| 8th | 6 months | 90% | 20.90 | 20.45 |

Thereafter Journeyman's Rate.

**Sign Cleaners**

| | | | | |
|---|---|---|---|---|
| Journeyman | $17.15 | $16.65 | TBA* | TBA* |
| **Apprentice - Starting** | 8.57 | 8.32 | | |
| 2nd 6 months - 70% | 12.00 | 11.65 | | |
| 3rd 6 months - 85% | 14.58 | 14.15 | | |
| 4th 3 months - 100% | 17.15 | 16.65 | | |

7



**Section 2.** Employees represented by the Group A Branch of the Union employed under this Agreement shall work under and shall be compensated therefore in accordance with the Agreement in effect between the Electrical Contractors, Association of City of Chicago and Local Union No. 134, International Brotherhood of Electrical Workers.

**Section 3.**    It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual employer will forward monthly to the NEBF's designated local collection agent an amount equal to 3% of the gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or craft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon seventy-two (72) hours notice in writing being served by the Union, provided the individual employer fails to show satisfactory proof that the required payments have been paid to the appropriate collection agent.

The failure of an individual employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of his labor agreement.

**Section 4.** It is understood between the parties that the wage rates set forth herein are minimum rates and employees receiving a higher wage rate shall suffer no reduction.

**Section 5.** A Health and Welfare Program covering all Glass Letter Bender Foremen, Glass Letter Bender Journeymen, Glass Letter Bender Apprentices, Group B Sign Maintenance Foremen, Group B Sign Maintenance Journeymen, Group B Sign Maintenance Apprentices and Sign Cleaners has been established.

~~For the period July 1, 2002, to and including June 30, 2003, the Employer shall pay to the Electrical Insurance Trustees the sum of $154.00 per week for a health and welfare plan for all employees covered by this Agreement. Paid vacations and holidays shall constitute time worked for the purpose of this Section~~.

For the period July 1, 2004 to and including June 30, 2005 the Employer agrees to pay $154.00 per week for a health and welfare plan for all employees covered by this Agreement. It is also agreed that if Electrical Insurance Trustees determine it necessary to raise the cost of the health and welfare plan to keep the current level of benefits, any such increase shall come out of wages.

**Section 6.** The contributions shall be made payable to Electrical Insurance Trustees Special Account, 221 North LaSalle Street, Chicago, Illinois 60601. The contributions shall be paid monthly and reported on forms which the Electrical Insurance Trustees will furnish to the Employer. The Employer agrees to be bound by and a party to the Agreement and Declaration of Trust creating the Electrical Insurance Trustees as if said Employer had executed the said Trust Instrument and agrees that the Employers' Association, who is a party to said Trust Instrument, shall designate the Employer Trustees under the terms and conditions provided for in said Trust Instrument, waiving all notice thereof and ratifying action taken by such Trustees acting with the scope of their authority.

**Section 7.** Effective July 1, 2004 to and including June 30, 2005 the Employer shall contribute $2.00 per week for all employees described in Section 5 of this Article to the Electrical Contractors, Association and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago, whose Trustees have adopted an actuarially sound pension program for such employees. Such contributions shall be made payable to the Electrical Insurance Trustees Special Account. 221 North LaSalle Street, Chicago, Illinois 60601. The contributions shall be paid monthly and reported on forms, which the Electrical Insurance Trustees will furnish to the Employer. It is also agreed that if Electrical Insurance Trustees determine it necessary to raise the per week contribution to keep the current level of benefits, any such increase shall come out of wages.

The Employer agrees to be bound by and a party to the Agreement and Declaration of Trust creating the Electrical Contractors, Association and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago, as if said Employer had executed the said Trust instrument and agrees that the Employers, Association, who is a party to said Trust Instrument, shall designate the Employer Trustees under the terms and conditions provided for in said Trust instrument, waiving all notice thereof and ratifying action taken by such Trustees acting within the scope of their authority.

**Section 8.** Effective July 1, 2004 to and including June 30, 2005 the Employer shall contribute $0.50 per hour for all employees described in Section 5 of this Article to the Electrical Contractors Association and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago, known As Pension Plan #5 whose Trustees have adopted an actuarially sound pension program for such employees. Such contributions shall be made payable to the Electrical Insurance Trustees Special Account at 221 North LaSalle Street, Chicago, Illinois 60601. The contributions shall be paid monthly and reported on forms which the Electrical Insurance Trustees will furnish to the Employer.

The Employer agrees to be bound by and a party to the Agreement and Declaration of Trust creating the Electrical Contractors, Association and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago, as if said Employer had executed the said Trust instrument and agrees that the Employers, Association, who is a party to said Trust Instrument, shall designate the Employer Trustees under the terms and conditions provided for in said Trust instrument, waiving all notice thereof and ratifying action taken by such Trustees acting within the scope of their authority.

**ARTICLE VIII**
**Vacations**

**Section 1.** Each classification of employees described in Article VI, Section 6 of this Agreement who have been employed for one (1) year and less than three (3) years by a particular Employer shall, on the anniversary date of their employment with the Company, be entitled to and receive one (1) week's vacation with forty (40) hours' pay at the regular straight time rates each calendar year.

**Section 2.** Each classification of employees described in Article VI, Section 6 of this Agreement who have been employed three (3) years or more by a particular Employer shall, on the anniversary date of his employment with the Company, be entitled to and receive two (2) week's vacation with eighty (80) hours' pay at the regular straight time rates each calendar year.

**Section 3.** Each classification of employees described in Article VI, Section 6 of this Agreement who have been employed ten (10) years or more by a particular Employer shall, on the anniversary date of his employment with the Company, be entitled to and receive three (3) week's vacation with one hundred twenty (120) hours' pay at the regular straight time rates each calendar year.

**Section 4.** Each classification of employees described in Article VI, Section 6 of this Agreement who have been employed twenty (20) years or more by a particular Employer shall, on the anniversary date of his employment with the Company, be entitled to and receive four (4) week's vacation with one hundred sixty (160) hours' pay at the regular straight time rates for each calendar year.

(a)   Employees covered by this Agreement who are eligible for vacation in accordance with Section 1 of this Article who are laid off or quit shall receive pro rated vacation allowance

to which they are en⬤d on the basis of three and one-third (3-1/3) hours' pay at their regular straight time rate for each month of earned vacation allowance, excluding fractions of a month.

(b)    Employees covered by this Agreement who are eligible for vacation in accordance with Section 2 of this Article who are laid off or quit shall receive the pro rated vacation allowance to which they are entitled on the basis of six and two thirds (6-2/3) hour's pay at their regular straight time rate for each month of earned vacation allowance, excluding fractions of a month.

(c)    Employees covered by this Agreement who are eligible for vacations in accordance with Section 3 of this Article who are laid off or quit, shall receive the pro rated vacation allowance to which they are entitled on the basis of ten (10) hours' pay at the regular straight time rate for each month of earned vacation allowance, excluding fractions of a month.

(d)    Employees covered by this Agreement who are eligible for vacations in accordance with Section 4 of this Article who are laid off or quit shall receive the pro rated vacation allowance to which they are entitled on the basis of thirteen and one-third (13-1/3) hours, pay at their regular straight time rate or each month of earned vacation allowance, excluding fractions of a month.

**Section 5.** Taking time off for vacation may be waived by mutual consent between the Employer and the Union provided there is a shortage of manpower that would justify this and in such event employees shall receive vacation pay in addition to their regular earnings.

## ARTICLE IX
## Funeral Leave

**Section 1.** In the instance of the death of a mother, mother-in-law, father, father-in-law, sister, brother, husband, wife or child of an employee covered by this Agreement, the Company will grant a paid leave of up to three (3) days to enable such employee to attend the funeral and otherwise assist in arrangements pertaining to the burial of any such member of the employee's family. Each day's pay shall consist of the employee's regular hourly rate for eight (8) hours and shall be applicable to those days within the regular workweek during which the employee is on paid leave.

**Section 2. Jury Duty.** An employee summoned for jury duty in a court case which necessitates absence from assigned company duty within the employee's Standard Weekly Work Schedule shall be granted up to four hours straight time pay for up to ten days for such absence. Such an employee shall report for regular assigned Company duty while excused from such attendance in court unless it is impossible or unreasonable to do so.

## ARTICLE X
## Wage and Fringe Benefit Performance Bond

**Section 1.** The Employer shall furnish two (2) bonds, each with corporate surety, one to guarantee the payment of wages with the Union as "obligee" and the other to guarantee the payment of the fringe benefit contributions with the Electrical Insurance Trustees as "obligee." The wage bond shall be on a standard from provided by the Union (an example is included in this Agreement); the fringe benefit bond shall be on a standard form provided by the Electrical Insurance Trustees (an example is included in this Agreement). The penal sum for contributions payable to the Electrical Insurance Trustees, exclusive of contributions payable for the Annuity Plan and the Additional Security Benefit Plan (ASBP), shall be $25,000; the bond shall provide for full payment of contributions for the Annuity Plan and for ASBP. The penal sum for contributions payable to the National Electrical Benefit Fund shall be $2,000. The wage bond shall provide for full payment of wages for each employee. There shall be no deductible on either bond.

10

**Section 2.** The Union is authorized to reject any wage bond it deems substandard. The Electrical Insurance Trustees are authorized to reject any fringe benefit bond they deem substandard.

**Section 3.** Each bond shall further provide that it may not be terminated without thirty (30) days prior written notice to the Union, the Electrical Insurance Trustees and the Employer.

### ARTICLE XI
### General Rules

**Section 1.** The Employer shall carry workmen's compensation insurance for all employees covered by this Agreement with a solvent company authorized to do business in this State.

**Section 2.** Should any provision of this Agreement be declared illegal by any court of competent jurisdiction such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall thereupon seek too negotiate substitute provisions which are in conformity with the applicable laws.

**Section 3.** All rules, schedules, benefits and privileges now in effect which have not been specifically referred to or changed by the provisions contained herein shall continue during the tenure of this Agreement unless changed by mutual consent between the parties.

**Section 4.** Union representatives will be allowed access to any shop during working hours.

**Section 5.** For safety purposes when assistance is needed, to protect ones safety, additional manpower will be furnished as in the past.

### ARTICLE XII
### Non-Discrimination

Neither the Company nor the Union shall unlawfully discriminate against any employee because of race, religion, color, sex, age, or national origin, or because he or she is handicapped, a disabled veteran or a veteran of the Vietnam era.

### ARTICLE XIII
### Labor/Management Committee

The parties will form a Labor/Management Committee to meet regularly to discuss matters of safety, training, and any other industry related needs.

IN WITNESS WHEREOF, the parties hereto have affixed their hands and seals this ___1st___ day of
___July___, 2004.

American Sign & Lighting Co.
COMPANY NAME

_____
PRESIDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL 134

_____
Business Representative

_____
Business Manager

Sign – 2002-2005

11

# C.W. Olson & Company, Inc.

**1701 Golf Rd, Tower Three, 7th Floor**
**Rolling Meadows, IL  60008**
**Phone 847- 427- 3531**
**Fax 312- 755- 9448**

October 15, 2007

```
08CV1749   PH
JUDGE BUCKLO
MAGISTRATE JUDGE COLE
```

Mr. Sean Madix
Electrical Insurance Trustees
221 N. LaSalle Street
Chicago, IL 60602

RE: Wages & Fringe Benefits Bonds
Bond Number: 03301/3637-S
Cancellation Effective: November 18, 2007
Local 134 Sign Bond

Gentlemen:

The surety company is exercising its option to cancel the bond for the following contractor
effective November 18, 2007:

**American Sign & Lighting Co.**
**307 East Lincoln Avenue**
**Bensenville, IL 60106**

Cancellation is at the request of the surety company, due to reported delinquencies.

We trust you will find this in order.  Should you have any questions, please do not hesitate to call
our office.

Very truly yours,

Matthew S. Meliker
C.W. Olson & Co.
847-427-3533

**RECEIVED**
OCT 1 7 2007
ELECTRICAL INSURANCE
TRUSTEES

CERTIFIED NO. 7005-1820-0005-2291-7715

CC:   T. Foley – Local #134          J. Donahue - JATC
      B. Reske – Local #134          M. Nemshick - NECA
      C. Dunne – Local #134          M. Krantz – EIT
      K. Montes – Local #134



EXHIBIT
B